Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL KAUFFMAN, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NATURAL HEALTH TRENDS CORP., CHRIS T. SHARNG, and TIMOTHY S. DAVIDSON, <br><br> Defendants. | Case No: <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

Plaintiff Daniel Kauffman ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Natural Health Trends Corp. ("Natural Health Trends" or the "Company"), and information readily obtainable on the Internet.

- 1 -
Class Action Complaint for Violation of the Federal Securities Laws

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired the securities of Natural Health Trends from April 27, 2016 through January 5, 2019, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Natural Health Trends and certain of its officers and directors for violations of federal securities laws.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1331.

4. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business in this District, maintain their principal place of business in this District, and a significant portion of Defendants' actions and the subsequent damages took place within this District.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the attached Certification, acquired Natural Health Trends securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Natural Health Trends operates as an international direct-selling and e-commerce company. Natural Health Trends is a Delaware corporation headquartered in Rolling Hills Estates, California. Its common stock trades on the NASDAQ under the ticker symbol "NHTC."

8. Defendant Chris T. Sharng ("Sharng") has served as the Company's President since February 2007, and as a director since March 2012.

9. Defendant Timothy S. Davidson ("Davidson") has served as the Company's Chief Financial Officer ("CFO") and Senior Vice President since February 2007.

10. Defendants Sharng and Davidson are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(g) approved or ratified these statements in violation of the federal securities laws.

Class Action Complaint for Violation of the Federal Securities Laws

12. Natural Health Trends is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Natural Health Trends under *respondeat superior* and agency principles.

14. Defendants Natural Health Trends and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
## Materially False and Misleading Statements

15. On April 27, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2016 (the "2016 1Q 10-Q"), which was signed by Defendant Davidson. The 2016 1Q 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sharng and Davidson stating that the financial information contained in the 2016 1Q 10-Q was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

16. The 2016 1Q 10-Q stated the following with regard to the Company's operations in China:

> China has been and continues to be our most important business development project. We operate an e-commerce direct selling model in Hong Kong that generates revenue derived from the sale of products to members in Hong Kong and elsewhere, including China. ***Through a separate Chinese entity, we operate an e-commerce retail platform in China. We believe that neither of these activities requires a direct selling license in China, which we do not currently hold.***
>
> \*   \*   \*
>
> Member commissions are typically our most significant expense and are classified as an operating expense. Under our compensation plan,

- 4 -
Class Action Complaint for Violation of the Federal Securities Laws

members are paid weekly commissions, generally in the currency for the country they were registered, for product purchases by their down-line member network across all geographic markets, *except China, where our subsidiary maintains an e-commerce retail platform and does not pay any commissions.*

(Emphasis added.)

17. On March 10, 2017, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Sharng and Davidson. The 2016 10-K contained signed SOX certifications by Defendants Sharng and Davidson stating that the financial information contained in the 2016 10-K was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

18. The 2016 10-K stated the following with regard to the Company's operations in China:

> Based on advice of our engaged outside professionals in existing markets, the nature and scope of inquiries from government regulatory authorities and our history of operations in those markets to date, *we believe our method of distribution complies in all material respects with the laws and regulations related to direct selling of the countries in which we currently operate*.
>
> At the end of 2005, China adopted new direct selling and anti-pyramiding regulations that are restrictive and contain various limitations, including a restriction on the ability to pay multi-level compensation to independent members. *We are not conducting direct selling in China. Rather, consumers and members purchase our products via our Hong Kong-based website or our e-commerce retail platform in China.* The regulatory environment in China is complex, and our operations in China can receive regulatory and media attention.
>
> The Chinese government scrutinizes activities of direct selling companies. Our business continues to be subject to regulations and examinations by municipal and provincial level regulators. At times, actions by government regulators have impacted our members' activities in certain locations, and have resulted in a few cases of enforcement

actions. In each of these cases, we helped our members with their defense in the legality of their conduct. So far, no material changes to our business model have been required. We expect to receive continued guidance and direction as we work with regulators to address our business model and any changes that need to be made to comply with the direct selling regulations.

*We believe that neither our Hong Kong-based website nor our e-commerce platform in China require a direct selling license in China, which we currently do not hold.*

\*   \*   \*

*In contrast to our operations in other parts of the world, we have not implemented a direct sales model in China. The Chinese government permits direct selling only by organizations that have a license, which we are in the process of applying for, and has also adopted anti-multilevel marketing legislation.* We operate an e-commerce direct selling model in Hong Kong and recognize the revenue derived from sales to both Hong Kong and Chinese members as being generated in Hong Kong. Products purchased by members in China are delivered to third parties that act as the importers of record under agreements to pay applicable duties. In addition, through a Chinese entity, we sell products in China using an e-commerce retail model. The Chinese entity operates separately from the Hong Kong entity, and a Chinese member may elect to participate separately or in both.

After consulting with outside professionals, we believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. *We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws.*

(Emphasis added).

19. On March 27, 2018, the Company filed an annual report on Form 10-K with the SEC for the year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants Sharng and Davidson. The 2017 10-K contained signed

Class Action Complaint for Violation of the Federal Securities Laws

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sharng and Davidson stating that the financial information contained in the 2017 10-K was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

20.  The 2017 10-K stated the following with regard to the Company's operations in China:

> *We believe our method of distribution complies in all material respects with the laws and regulations related to direct selling in the countries in which we currently operate, based on advice of our engaged outside professionals in existing markets, the length of time we have been operating under our Hong Kong business model, guidance provided by governmental regulatory authorities and our history of operations to date.*
>
> At the end of 2005, China adopted new direct selling and anti-pyramiding regulations that are restrictive and contain various limitations, including a restriction on the ability to pay multi-level compensation to independent members. *We are not conducting direct selling in China. Rather, consumers and members purchase our products via our Hong Kong-based website or our e-commerce retail platform in China.* The regulatory environment in China is complex, and our operations in China can receive regulatory and media attention.
>
> The Chinese government scrutinizes activities of direct selling companies. Our business continues to be subject to regulations and examinations by municipal and provincial level regulators. At times, actions by government regulators have impacted our members' activities in certain locations, and have resulted in a few cases of enforcement actions. In each of these cases, we helped our members with their defense in the legality of their conduct. So far, no material changes to our business model have been required. We expect to receive continued guidance and direction as we work with regulators to address our business model and any changes that need to be made to comply with the direct selling regulations.

> *We believe that neither our Hong Kong-based website nor our e-commerce platform in China require a direct selling license in China, which we currently do not hold.*
>
> * * *
>
> *In contrast to our operations in other parts of the world, we have not implemented a direct sales model in China. The Chinese government permits direct selling only by organizations that have a license, which we are in the process of applying for, and has also adopted anti-multilevel marketing legislation.* We operate an e-commerce direct selling model in Hong Kong and recognize the revenue derived from sales to both Hong Kong and Chinese members as being generated in Hong Kong. Products purchased by members in China are delivered to third parties that act as the importers of record under agreements to pay applicable duties. In addition, through a Chinese entity, we sell products in China using an e-commerce retail model. The Chinese entity operates separately from the Hong Kong entity, and a Chinese member may elect to participate separately or in both.
>
> After consulting with outside professionals and certain Chinese authorities, and given the length of time we have been operating under our Hong Kong business model, we believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. *We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws.*

(Emphasis added).

21. On May 2, 2018, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended March 31, 2018 (the "2018 1Q 10-Q"), which was signed by Defendant Davidson. The 2018 1Q 10-Q contained signed SOX certifications by Defendants Sharng and Davidson stating that the financial information contained in the 2018 1Q 10-Q was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

22. The 2018 1Q 10-Q stated the following with regard to the Company's operations in China:

> China has been and continues to be our most important business development project. We operate an e-commerce direct selling model in Hong Kong that generates revenue derived from the sale of products to members in Hong Kong and elsewhere, including China. ***Through a separate Chinese entity, we operate an e-commerce retail platform in China. We believe that neither of these activities requires a direct selling license in China, which we do not currently hold.***
>
> \* \* \*
>
> Member commissions are our most significant expense and are classified as an operating expense. Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions.***

(Emphasis added.)

23. On August 1, 2018, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2018 (the "2018 2Q 10-Q"), which was signed by Defendant Davidson. The 2018 2Q 10-Q contained signed SOX certifications by Defendants Sharng and Davidson stating that the financial information contained in the 2018 2Q 10-Q was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

24. The 2018 2Q 10-Q stated the following with regard to the Company's operations in China:

> China has been and continues to be our most important business development project. We operate an e-commerce direct selling model in Hong Kong that generates revenue derived from the sale of products to members in Hong Kong and elsewhere, including China. Substantially all of our Hong Kong revenues are derived from the sale of products that are delivered to members in China. ***Through a separate Chinese entity, we operate an e-commerce retail platform in China. We believe that neither of these activities requires a direct selling license in China, which we do not currently hold.***

\* \* \*

Member commissions are our most significant expense and are classified as an operating expense. Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions.***

(Emphasis added.)

25. On October 30, 2018, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2018 (the "2018 3Q 10-Q"), which was signed by Defendant Davidson. The 2018 3Q 10-Q contained signed SOX certifications by Defendants Sharng and Davidson stating that the financial information contained in the 2018 3Q 10-Q was accurate, all fraud was disclosed, and any material changes to the Company's internal control over financial reporting were disclosed.

26. The 2018 3Q 10-Q stated the following with regard to the Company's operations in China:

China has been and continues to be our most important business development project. We operate an e-commerce direct selling model in Hong Kong that generates revenue derived from the sale of products to members in Hong Kong and elsewhere, including China. Substantially all of our Hong Kong revenues are derived from the sale of products that are delivered to members in China. ***Through a separate Chinese entity, we operate an e-commerce retail platform in China. We believe that neither of these activities requires a direct selling license in China, which we do not currently hold.***

\* \* \*

Member commissions are our most significant expense and are classified as an operating expense. Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic

markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions.***

(Emphasis added.)

27. The statements referenced in ¶¶15-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Natural Health Trends' business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Natural Health Trends was operating as a pyramid scheme in China, which is contrary to Chinese law; (2) consequently, Natural Health Trends was not in compliance with applicable Chinese law; and (3) as a result, Defendants' statements about Natural Health Trends' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

28. On January 7, 2019, *GeoInvesting* reported that *China Central Television*, a prominent state television broadcaster in China, aired an exposé on Saturday, January 5, 2019, asserting that Natural Health Trends was operating as a pyramid scheme in China, contrary to Chinese law. According to *GeoInvesting*, an expert on the CCTV program claimed that the Company is a pyramid scheme because it actually makes money by recruiting members, even though its business appears to be selling juice. Additionally, the program claimed that one of the Company's products, Noni Juice, does not have domestic approval and registrations related to wellness foods.

29. On this news, shares of Natural Health Trends fell $4.89 per share or over 24% from its previous closing price to close at $14.88 per share on the next day the market was open, January 7, 2019. As a result, Natural Health Trends investors were damaged.

Class Action Complaint for Violation of the Federal Securities Laws

30. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Natural Health Trends securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, the officers and directors of Natural Health Trends, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

32. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Natural Health Trends securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

33. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Natural Health Trends;
- whether the Individual Defendants caused Natural Health Trends to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Natural Health Trends securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

37. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

Class Action Complaint for Violation of the Federal Securities Laws

1  (d)  the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)  the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)  Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

38. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

39. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violations of Section 10(b) of The Exchange Act and Rule 10b-5
Against All Defendants**

40. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

Class Action Complaint for Violation of the Federal Securities Laws

42. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

44. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

45. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members

of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

46. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

47. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

48. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violations of Section 20(a) of The Exchange Act
Against The Individual Defendants**

49. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

50. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

51. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

52. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

53. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

54. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

Class Action Complaint for Violation of the Federal Securities Laws

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 8, 2019                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*