Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL KAUFFMAN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>NATURAL HEALTH TRENDS CORP., CHRIS T. SHARNG, and TIMOTHY S. DAVIDSON,<br><br>    Defendants. | Case No: 2:19-CV-00163-MWF-JPR<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Xia Yang ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon*, inter alia*, the investigation conducted by and through Plaintiff's attorneys that included, among other things, reviewing Defendants' public documents, conference calls, and public announcements, the United States Securities and Exchange Commission ("SEC") filings of Natural Health Trends Corp. ("NHTC" or "Company"), wire and press releases and other information readily

- 1 -

obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants[1] and their affiliates, who purchased or otherwise acquired the securities of NHTC from April 27, 2016 through February 21, 2019, both dates inclusive ("Class Period"). Plaintiff pursues remedies against NHTC and certain of its officers and directors for violations of federal securities laws.

2.     On January 5, 2019, China Central Television ("CCTV"), the top state-run media organization in the People's Republic of China ("China" or "PRC"), broadcast a news program ("CCTV Exposé")[2] revealing, among other things, that: (i) NHTC was operating as a pyramid scheme in contravention of Chinese laws and directly contrary to Defendants' vigorous public denials, (ii) the Company had been making false and misleading claims about the health effects of one of the Company's leading products, known as "Noni Juice"; and (iii) the Company was packaging its health foods as foreign products to attract domestic consumer attention, misleading Chinese consumers regarding the origin of the products they purchased. On January 7, 2019, in reaction to the CCTV Exposé, investors bid down the price of NHTC common stock by approximately 14% on relatively large volume of 789,000 shares traded.

3.     On February 21, 2019, after the close of trading, NHTC disclosed that, in the face of "adverse local publicity and the Chinese government's 100-day campaign" against suspected illegal practices involving health products, the Company had

---

[1] The Defendants include: NHTC; its president, Chris T. Sharng ("Sharng"); and its chief financial officer, Timothy S. Davidson ("Davidson").

[2] Attached hereto as Exhibit A and incorporated herein by reference is an English translation of the CCTV Exposé.

"voluntarily decided in January to temporarily suspend" its business operations "to ensure we continue to conduct our business in compliance with all applicable laws in China." The Company advised the market that "this suspension of member activities may have a material adverse effect on our business in the near-term."[3] On this news, the Company's stock opened on February 22, 2019 at $12.26 per share, a decline of an additional 13% from the $14.11 close on February 21, 2019. As of the filing of this complaint, NHTC's operations remain suspended.

4.    During the Class Period, from April 27, 2016 through February 21, 2019, both dates inclusive, NHTC and certain of its officers affirmatively misrepresented that the Company complied with Chinese laws that render pyramid schemes illegal and prohibit misleading consumers about the benefits of its products. In fact, contrary to their myriad claims and denials, NHTC's operations in the PRC – where the Company generated substantially all of its revenue – were a pyramid scheme. The Company compensated its "members" – consumers who sold the Company's products to other consumers – and employees for recruiting new members and requiring members to purchase the Company's products. In addition, in contravention of Chinese laws and regulations, the Company misled Chinese consumers about the health benefits and origin of its products.

5.    With respect to improper commissions, Defendants stated publicly that the Company's members could earn commissions: (1) based on product purchases made by their "down-stream" members;[4] and (2) through retail markups on sales of products purchased by members at wholesale prices. Defendants also assured investors

---

[3] As explained below, the Company refers to its salespersons as "members" and considers them independent contractors, rather than employees.

[4] The Company encourages members to recruit other, "down-stream" members to sell its products. Thus, for example, if Member A recruits Member B and Member C into an organization, Members B and C are Member A's down-stream members.

Amended Class Action Complaint for Violation of the Federal Securities Laws

that the Company's China subsidiary did not pay commissions, a practice that, under certain circumstances detailed below, Chinese law prohibits.

6.     Defendants' statements regarding NHTC's payment of commissions were materially false and misleading. As the CCTV Exposé revealed, Defendants failed to disclose that the Company compensates its members and employees in China based on the number of new members they recruited. Defendants knew or were reckless in not knowing that in direction contravention of Chinese law and regulation, Defendants rewarded members and employees for recruiting additional members irrespective of their sales performance.

7.     Defendants also stated that the Company's e-commerce direct selling model in Hong Kong and its e-commerce retail platform in the PRC complied with applicable Chinese laws and regulations. Such statements were materially false and misleading, however, because the Company's sales of Noni Juice product within the PRC comply with neither of the two requirements for entry as a foreign health food into the Chinese domestic market. As the CCTV Exposé revealed, the State Supervisory Authority did not authorize the sale of Noni Juice nor was NHTC compliant with the PRC's requirements for cross-border e-commerce. Defendants therefore knew or were reckless in not knowing that their statements regarding compliance with e-commerce and direct selling laws in the PRC were false and misleading.

8.     In addition, Defendants attributed the Company's financial successes during the Class Period to various factors while omitting any mention of NHTC's illegal conduct and affirmatively misrepresenting its compliance. Defendants' omission of their pyramid scheme operations and/or contravention of the law and regulations for foreign health foods rendered their statements regarding the Company's financial success false and misleading because NHTC's success resulted directly from

Amended Class Action Complaint for Violation of the Federal Securities Laws

its illegal conduct, rather than the various other factors Defendants identified, depriving investors of information material to the sources of the Company's success.

9.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1331.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Defendants conduct business in this District, maintain their principal place of business in this District, and a significant portion of Defendants' actions and the subsequent damages took place within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

Amended Class Action Complaint for Violation of the Federal Securities Laws

**PARTIES**

14.   Plaintiff, as set forth in the Certification submitted in connection with Plaintiff's lead plaintiff motion filed in this action, (ECF No. 10-2), acquired NHTC securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

15.   NHTC operates as an international direct-selling and e-commerce company. NHTC was originally incorporated as a Florida corporation in 1988, but reincorporated as a Delaware corporation in 2005. In January 2019, the Company relocated its corporate headquarters from Rolling Hills Estates, California to Hong Kong. Its common stock trades on the NASDAQ under the ticker symbol "NHTC."

16.   Defendant Sharng has served as the Company's President since February 2007, and as a director since March 2012.

17.   Defendant Davidson has served as the Company's Chief Financial Officer ("CFO") and Senior Vice President since February 2007.

18.   Together, Sharng and Davidson are "Individual Defendants." Each of the Individual Defendants:

(a)   directly participated in the management of the Company;

(b)   was directly involved in the day-to-day operations of the Company at the highest levels;

(c)   was privy to confidential proprietary information concerning the Company and its business and operations;

(d)   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

- 6 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

(f)     certified, pursuant to the Sarbanes-Oxley Act of 2002, as to the Company's compliance with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and to the Company's quarterly and annual reports filed with the Securities and Exchange Commission during the Class Period as having fairly presented, in all material respects, the financial condition and results of operations of the Company;

(g)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(h)     approved or ratified these statements in violation of the federal securities laws.

19.     NHTC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to NHTC under *respondeat superior* and agency principles.

21.     NHTC and the Individual Defendants are collectively referred to herein as "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Background**</u>

***The Company and its Business***

22.     NHTC describes itself as "an international direct-selling and e-commerce company" whose subsidiaries sell personal care, wellness, and "quality of life" products under the "NHT Global" brand. NHTC's subsidiaries are located in mainland China, Hong Kong, and elsewhere.

23.    The Company offers a line of "NHT Global" branded products in seven distinct categories: wellness, herbal, beauty, lifestyle, home, baby, and active.  Among NHTC's principal wellness products is Noni Juice from which the Company derives more than 10% of its total revenue.

24.    NHTC distributes its products internationally primarily through a network marketing system, which is a form of person-to-person direct selling. The Company relies upon its "members" to market its products based on the strength of personal recommendations to friends, neighbors, relatives, and close acquaintances. The Company states that "[v]irtually all of [its] members are independent full-time or part-time contractors who purchase products directly from [its] subsidiaries via the internet for their own personal consumption or for resale to retail consumers." The Company notes, however, that "[p]urchasers of [its] products in some of [its] smaller markets and purchasers of [its] products from [its] China subsidiary may purchase only for their own personal consumption and not for resale."

25.    As of December 31, 2018, the Company employed 153 total full-time employees worldwide, of which 102 were located in Greater China (Hong Kong, China, and Taiwan). The Company states that it "incur[s] a low level of overhead and are run by a small number of executives, who rely on a small group of employees," and that its "future success depends to a significant degree on the skills, experience and efforts of our top management and directors."

26.    The Company conducts its business almost exclusively in Greater China. Its Hong Kong operations "account for a substantial portion of our overall business, and substantially all of our Hong Kong business is derived from the sale of products to members in China." NHTC reports that "[i]n 2018 and 2017, approximately 88% and 89% of [its] revenue, respectively, was generated in Hong Kong. Substantially all of [its] Hong Kong revenues are derived from the sale of products that are delivered to members in China."

Amended Class Action Complaint for Violation of the Federal Securities Laws

*China Central Television and the CCTV Exposé*

27.     Incorporated in 1958, China Central Television ("CCTV") is the top state-level media organization controlled by the China Communist Party and the Government of the People's Republic of China. China's State Administration of Press, Publication, Radio, Film and Television currently manages CCTV. Accordingly, the Chinese government approves the content of all CCTV programs. CCTV operates news channel CCTV 13. On January 5, 2019, CCTV 13 aired the CCTV Exposé, which was the result of a "several-month-long investigation."

*CCTV Exposé on NHTC's Compensation Policy*

28.     The CCTV Exposé described with particularity indicia that in violation of PRC laws and regulations, NHTC operated as an illegal pyramid scheme. Prospective new members are lured by promises made in NHTC training sessions that after just a few years of work, a member could be making "tens of millions" of yuan: "First, they begin by explaining how much money you will make by buying the goods. More importantly, many participants, all-too-readily believe the pie-in-the-sky stores promised to them by organizers and leaders."

29.     At NHTC, membership – at least on its surface – has its privileges. One "senior member" of NHTC, identified as "Ms. Hu," who resides in Wuhan, China, explained: "Why? Because you have taken this spot due to this 20,000 RMB. The points of all the people under you are connected with you. His points are connected with you. The people he recruits later and the members he recommends have something to do with you for the whole lifetime." She also claimed that, "[o]nce you achieve platinum grade, you can be a representative in 48 countries. On the internet, you can do business all over the globe. Many people have achieved financial freedom by way of working hard for three to five years."

30.     Mr. Ye, another "senior member" of NHTC and a resident of Chongqing, PRC, further explained: "Each level has different rewards. With the increasing of your

- 9 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

level, the company will give you certain benefits. At level 9, the highest level, your children can go to the United States and study for free."

31.     The CCTV Exposé also revealed that to lure new members, NHTC paid current members commissions for enrolling additional members. The Company expressly instructed new members that they earned commissions for recruiting down-stream members, stating, "[n]ot only will you receive discounts on buying products, but you can also make money by recruiting new members." On this point, the CCTV Exposé showed a clip from one of NHTC's "online sharing meetings" that the Company "made especially for members" and restricted to them. According to the CCTV Exposé, this online content was "extremely private, and you must first purchase [NHTC] products and become a member before you can acquire a login account and password. The content focuses mainly on higher-level members teaching new members how to deal with family members, how to boast about the products, and how to recruit downline." During the clip from the online sharing meeting, the speaker stated as follows:

> Let's take another look at one of the reason for doing NHT—it is our profit model. It has been called the 8th Wonder of the World. If you only recommend two members in the first month, your income will be 116 USD. Then, in the second month, if it's doubled to four members, then your income is 332 USD, increasing by a factor of 2 to the $n$-th power. So, my total annual income is 679770 USD.

***Former NHTC Employees Confirm NHTC's Payment of Commissions in China***

32.     Former employees of NHTC confirmed that the Company has been paying commissions in the PRC. Former Employee 1 ("FE 1")[5] received commissions by

---

[5] FE 1 was a sales representative at NHTC Changzhou from April 2012 to January 2014. During FE 1's employment at NHTC in such capacity, FE 1 was responsible for

recruiting new members and selling products to such new members. FE 1 stated that according to the Company's regulations, employees could not obtain any commissions based on his or her sales performance, but that as a sales representative, commissions actually comprised a material portion of FE 1's earnings since NHTC provided FE 1 with only a low base salary.

33.    Former Employee 2 ("FE 2")[6] confirmed that NHTC paid commissions based on either sales performance or the number of new members recruited. FE 2 also confirmed that such commissions were offered and made available to FE 2.

*CCTV Exposé Details the Impact of NHTC's Pyramid Scheme*

34.    Not only did NHTC's sales methods indicate that it operated as a pyramid scheme in violation of PRC law and regulations, but the CCTV Exposé detailed the paradigmatic and pernicious impact on NHTC's members, supporting that NHTC operated an illegal pyramid scheme. As the CCTV Exposé explained, "many members do not obtain the benefits promised in the propaganda, but rather, deeply suffer from them. Because the products produce no miraculous effects, they are difficult to sell." Members often "pay with their own money in order to receive the bonuses that come with offline points and maintain their level," incurring "a heavy debt" because they are required to make an initial purchase of no less than 18,000 RMB to become members. NHTC's membership point system then forces members to remain in the system: "You have to keep buying products again and again to ensure that you don't drop down a level and waste all your previous efforts."

---

recruiting new members through networking and tourism, training and communicating with new members, improving members' sales performance.

[6] FE 2 was an operations manager at NHTC Beijing from November 2014 to June 2015. During FE 2's employment at NHTC in such capacity, FE 2 was responsible for supervising daily operations at the Beijing branch and administrative duties. FE 2 also provided support for operations at NHTC's Tianjin, Hebei, and Inter Mongolia branches.

Amended Class Action Complaint for Violation of the Federal Securities Laws

35.    As a result, becoming an NHTC member leaves many destitute, their families in discord, and their homes serving merely as storage units for unwanted NHTC products. The CCTV Exposé revealed how several NHTC members' experiences affected them.

36.    An individual known as "Ms. Liu," who resides in Wuhan, China with her husband, "opened a shop and did business together there." NHTC left Ms. Liu's husband "cling[ing] to his cell phone" "[e]very night," with "many health care products at home," and Ms. Liu had "discovered a lot of products [from NHTC] in our family warehouse." According to the CCTV Exposé, Ms. Liu's husband "got obsessed," continually falling "deeper and deeper into it." Over the past year, according to Ms. Liu, her husband "not only failed to make any money but has also incurred a heavy debt. She often argues with her husband and their feelings for each other are on the verge of destruction."

37.    Mr. Ye fared somewhat better, according to the CCTV Exposé, but only because "when Mr. Ye discovered that there was nothing special about the products, he opted out. However, his wife had become deeply involved with it, and eventually divorced Mr. Ye because of her obsession."

38.    The cases of Mr. Ye and Ms. Liu, according to the CCTV Exposé, "are not isolated cases. There are family victims of similar experiences in many areas of the country," including especially in "southern areas [of the PRC], like Guangzhou, Shenzhen, Wuhan, and Changsha." According to Ms. Liu, "There are worse cases than mine: families fell apart and people lost everything. The families of nearly every person who enters this group have either become divorced or bankrupt." Mr. Ye stated: "Everyone is counting up and adjusting their points. Some people spent over 200000, finally buying a room full of the stuff, and eventually they fall to the very bottom."

Amended Class Action Complaint for Violation of the Federal Securities Laws

***CCTV Exposé on Application of the Pyramid Law***

39.     The CCTV Exposé then explained although Mr. Ye had reported NHTC to Chinese authorities based on his suspicions that the Company had engaged in "pyramid behavior," he understood that such authorities did not have legal jurisdiction to prosecute NHTC or its officers under China's Regulation on Prohibition of Pyramid Selling ("Pyramid Law").

40.     The CCTV Exposé explained the provisions of the Pyramid Law and the issues surrounding the jurisdiction of Chinese authorities to prosecute violators such as NHTC under the Pyramid Law.

41.     By way of background, the Pyramid Law, effective since November 1, 2005, generally prohibits, among other things, the compensation of participants in an organization for recruiting additional participants based either on the additional participants' product sales or the number of additional participants they recruit.[7]

42.     Article 2 of the Pyramid Law defines "pyramid selling" as "such an act whereby an organizer or operator seeks for unlawful interests, disturbs the economic order and affects the social stability by recruiting persons, calculating and paying remunerations to recruiters on the basis of the number of persons a recruiter has directly or indirectly recruited or the sales performance, or asking the recruiters to pay a certain fee for obtaining the qualification for participation."

43.     Article 7 of the Pyramid Law states that the following acts constitute pyramid selling:

> (1) An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling, calculating and paying remunerations

---

[7] Attached hereto as Exhibit B and incorporated herein by reference is an English translation of the Pyramid Law.

(including material awards and other economic interests, the same below) to the recruiters on the basis of the number of persons a recruiter has directly or indirectly recruited in a rotating way;

(2) An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling and asking the recruiters to pay fees explicitly or in any disguised form like purchasing commodities for obtaining the qualification for participating in pyramid selling or recruiting others to participate in pyramid selling; and

(3) An organizer or operator seeks for unlawful interests by recruiting persons to participate in pyramid selling, asking the recruiters to persuade others to participate in pyramid selling so as to form a multi-level relationship, and calculating and paying the remuneration to an upper-level promoter on the basis of the sales performance of the promoters below.

44.    The CCTV Exposé then presented the views of Yushan Yue, a legal expert, who stated:

Just like this making money in the name of selling juice but actually using this form of, it can essentially be categorized as belonging to pyramid scheme behavior. Because we note that pyramid schemes are not so much about selling products. But rather, they are about recruiting others and determining income on the basis of one's level.  Then this is usually what we call a pyramid scheme. In serious instances, it may even violate criminal law. Our country's criminal law clearly states that the following activities are punishable by up to five years of imprisonment or criminal detention and can also be fined, and if the circumstances are very serious, these activities are punishable by no less than five years of imprisonment or criminal detention and can also be fined: in the name of promoting merchandise or providing services conduct events that require participants to qualify by membership via submitting payment, purchasing

Amended Class Action Complaint for Violation of the Federal Securities Laws

merchandise services, or other methods, while in accordance with a certain order that forms a hierarchy, taking the number of directly or indirectly recruited personnel as the basis for remuneration or legislation, to lure and force participants to continue to recruit other participants, defraud property, disrupt economic and social order, or engage in other pyramid scheme activities.

One side we should pay attention to the penalties or sentences meted out to organizers and leaders, as well as those whose roles are planning, initiation, and operation, those who are responsible for coordinating management as well as training and publicity in pyramid scheme marketing, for those who have already been penalized for organizing and leading pyramid scheme activities or who have been organizing or leading pyramid scheme activities within one year, or those who directly or indirectly recruit personnel into hierarchies with 15 or more individuals and three or more segmented levels, including other personnel who may play key roles in implementing, establishing, and expanding pyramid scheme activities. These personnel are all very likely to have committed criminal offenses, and if over 30 individuals participate in the scheme and there are over three segmented levels, then generally speaking, organizers and leaders can be prosecuted for criminal liability.

We have also discovered that some pyramid schemes may have come in from abroad. At the current time, we should focus on whether or not others have carried our pyramid scheme activities domestically. If pyramid scheme activities are carried out domestically, we have the corresponding authority to deal with them, that is the corresponding jurisdiction. At this time, we can impose administrative penalties, including criminal punishment, if they remain within our territory. If leaders are overseas or remotely commands from abroad, then our country can deal with these perpetrators through legal assistance activities with other countries.

Amended Class Action Complaint for Violation of the Federal Securities Laws

45.    The CCTV anchor added: "[T]he expert also conveyed that the internet is not an extrajudicial place. As long as the online marketing activities of these overseas enterprises touch on Chinese territory, they are under the jurisdiction of Chinese law. The next step is to include these overseas enterprises in the dishonest blacklist as soon as possible."

***The Company's Compensation Policy***

46.    The PRC's Pyramid Law prohibits, among other things, (i) the Company's payment of commissions to members based on either the number of new members they recruit or the sales performance of such new members, and (ii) the Company's requirement that new members pay an entry fee to participate in the Company's membership points system. Contrary to the Company's actual compensation structure and in direct violation of PRC law and regulation, NHTC directed, implemented, and encouraged the spread of such business practices in China. Defendants publicly described NHTC's direct sales model as follows:

> In contrast to our operations in other parts of the world, we have not implemented a direct sales model in China. The Chinese government permits direct selling only by organizations that have a license, which we are in the process of applying for, and has also adopted anti-multilevel marketing legislation.
>
> ***
>
> Enrolling new members creates multiple levels in our direct selling structure. The persons that a member enrolls within the network are referred to as "sponsored" members, who may purchase product solely for their own personal consumption, for resale, or both. Persons newly enrolled are assigned into network positions that can be "under" other members, and thus they can be called "down-line" members. If down-line members also enroll new members, they create additional levels within the structure, but their down-line

Amended Class Action Complaint for Violation of the Federal Securities Laws

members remain in the same down-line network as the original member that introduced them to our business.

While we provide informational brochures and other sales materials, members are primarily responsible for enrolling and educating their new members with respect to products, the compensation plan and how to build a successful membership network.

47.     The process by which more senior members of NHTC educate new members involves participating in "sharing meetings," which are "extremely private" events that are reserved exclusively for members. One must become a member of NHTC to obtain access to the sharing meetings via an account log-in and password. During the sharing meetings, "[t]he content focuses mainly on higher-level members teaching new members how to deal with family members, how to boast about the products, and how to recruit offline."

48.     The Company has explained how it compensates members in public statements as follows:

We employ what is commonly referred to as a binary compensation plan, enhanced with certain unilevel features. Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled for product purchases by their down-line member network across all geographic markets. Our China subsidiary maintains an e-commerce retail platform and does not pay commissions. This "seamless" compensation plan enables a member located in one country to sponsor other members located in other countries. Currently, there are basically two ways in which members can earn income:

• Through commissions paid on the accumulated bonus volume from product purchases made by their down-line members and customers; and

• Through retail profits on sales of products purchased by members at discount and wholesale prices and resold at retail

Amended Class Action Complaint for Violation of the Federal Securities Laws

prices (in some markets, sales are for personal consumption only and income may not be earned through retail profits).

Each of our products is designated a specified number of bonus volume points. Commissions are based on total personal and group bonus volume points per sales period. Bonus volume points are essentially a percentage of a product's wholesale price. As the member's business expands, the member receives higher commissions from purchases made by an expanding down-line network. To be eligible to receive commissions, a member may be required to make nominal monthly or other periodic purchases of our products. Certain of our subsidiaries do not require these nominal purchases for a member to be eligible to receive commissions. In determining commissions, the number of levels of down-line members included within the member's commissionable group increases as the number of memberships directly below the member increases. Under our current compensation plan, some of our commission payout may be limited to a hard cap dollar amount per week or a specific percentage of the total product sales. In some markets, commissions may be further limited.

49.     With respect to the Company's rules affecting its members, NHTC has stated publicly the following:

Our member policies and procedures establish the rules that members must follow in each market. We also monitor member activity in an attempt to provide our members with a "level playing field" so that one member may not be disadvantaged by the activities of another. We require our members to present products and business opportunities in an ethical and professional manner. Members further agree that their presentations to customers must be consistent with, and limited to, the product claims and representations made in our literature.

Our policies and procedures state that we produce or pre-approve all sales aids used by members such as presentations[,] videotapes, audiotapes, brochures and

promotional clothing. Further, members may not use any form of media advertising to promote products unless it is pre-approved by us. Members are not entitled to use our trademarks or other intellectual property without our prior consent.

Our compliance and member services department reviews reports of alleged member misbehavior. If we determine that a member has violated our member policies or procedures, we may terminate the member's rights completely. Alternatively, we may impose sanctions, such as warnings, probation, withdrawal or denial of an award, suspension of privileges of the membership, fines, withholding commissions, until specified conditions are satisfied or other appropriate injunctive relief. Our members are independent contractors, not employees, and may act independently of us. Further, our members may resign or terminate their membership at any time without notice.

50.     The Company claims to "have developed and rolled out a comprehensive training system that provides a complete career path appropriate for our members. Our training material covers the needs of our members, be they prospects, new recruits, product evangelists, sales leaders or dream builders." The Company also states, however, that "we primarily rely upon existing members to enroll and train new members and to motivate new and existing members," and that "members are primarily responsible for enrolling and educating their new members with respect to products, the compensation plan and how to build a successful membership network."

*The PRC's Advertising Law*

51.     The CCTV Exposé also revealed that NHTC violated Chinese law and regulations illegal marketing of Noni Juice in the PRC. The Company made false claims regarding certain health benefits of the product and misled consumers in the PRC regarding the origin of the product.

Amended Class Action Complaint for Violation of the Federal Securities Laws

52.     By way of background, China's amended Advertising Law, effective since September 1, 2015,[8] generally applies to "the commercial advertising activities of goods or services that are directly or indirectly introduced by commodity operators or service providers within the territory of the People's Republic of China through certain media and forms."

53.     Article 4 of the Advertising Law provides: "Advertisements must not contain false or misleading content, and must not deceive or mislead consumers."

54.     Article 18 states: "Health food advertisements shall not contain the following contents: (1) assertions or guarantees indicating efficacy and safety; (2) involving disease prevention and treatment functions; (3) claiming or implying that the advertising commodity is necessary for the protection of health; (4) comparing with medicines and other health foods; (5) using the advertising spokesperson as a recommendation and proof; (6) other contents prohibited by laws and administrative regulations.

***CCTV Exposé on Noni Juice***

55.     The CCTV Expose disclosed and supported that NHTC illegally marketed Noni Juice in the PRC, falsely claiming certain health benefits of the product. The CCTV Exposé noted that NHTC, known as "Ranjian Global" in the PRC, "claims to have a foreign fruit juice originating from the United States that can cure all kinds of diseases, with miraculous effects." The news program then featured an excerpt from an interview of Ms. Hu, who explained that Noni Juice "can comprehensively restore damaged cells in the human body, letting them return to their original condition." Ms. Hu stated that Noni Juice "specializes in repairing damaged cells in human bodies" and

---

[8] Attached hereto as Exhibit C and incorporated herein by reference is an English translation of the People's Republic of China Advertising Law.

is "very effective against cancer, gout, insomnia, kidney deficiencies, excessive stress, and depression."

56.     The CCTV Exposé then presented the statement of the Secretary General of China Nutrition and Health Food Association, Xuecong Liu, who refuted Ms. Hu's claims about Noni Juice. Secretary General Liu stated: "Regarding the treatment of disease, we understand the essential nature of medicine. Aside from medicine, all foods are ineffective in treating illnesses. So, I believe that this point should be relatively simple to understand."

57.     Next, the CCTV Exposé revealed that Noni Juice, this "foreign fruit juice made in the United States," is not listed among the four types of health foods listed on the NHTC website. The CCTV reporter then visited the NHTC headquarters in Guangzhou, China for further information, but was unable to obtain any information about Noni Juice while there. Instead, the CCTV reporter learned from a Ms. Zhou, another "senior member" of NHTC," that NHTC is a "global online supermarket, with a membership point system," and is "classified as doing hybridized e-commerce." Ms. Zhou stated that "[a]ll of our edible products are imported from abroad."

58.     Ms. Zhou also told the CCTV reporter that the foods listed on the Hong Kong website, including Noni Juice, "have already received standard certification abroad, and do not need to pass domestic inspection and approval of health foods or be entered into the record." Again, however, Secretary General Liu refuted Ms. Zhou's claim, stating: "Abroad, to a large extent, this kind of dietary supplement belongs to our health food category, but it may not be able to conform to the corresponding standards for this kind of health food in China."

59.     The CCTV Exposé then summarized the views of experts regarding the entry of foreign health foods into the domestic market in China: "Experts point out that there are currently two kinds of formal channels for foreign health foods to enter the Chinese market. One is that products are sold directly and offline at a retail store with

Amended Class Action Complaint for Violation of the Federal Securities Laws

the blue hat logo of approval from the State Supervisory Authority. Another is to meet the current requirements for cross-border e-commerce." The CCTV reporter revealed that "[NHTC] uses a selling style similar to abroad purchase and does not belong to either category."

60.    The CCTV Exposé explained that the origin of NHTC's products is significant because of the association that Chinese consumers make between product origin and product packaging. NHTC's packaging of Noni Juice as a foreign health food product causes confusion among consumers:

> In recent years, goods from overseas have become widely sought after by domestic consumers, with foods especially claiming to possess health effects becoming the focus of purchases. We can see that this health juice product has adopted the method of wearing a foreign jacket and caught the attention of domestic consumers. [NHTC] claims that this juice originates in the United States. If consumers want to purchase it, they can order it from the Hong Kong website of [NHTC], and it is not available on the official domestic website. Consumers believe they have purchased this product from abroad, but in fact there is no domestic approval or listing in the record of this health food.

### The Company's Sales Model

61.    NHTC's brand of "hybridized e-commerce" is not authorized by the State Supervisory Authority nor is it compliant with the PRC's current requirements for cross-border e-commerce. Rather than acknowledge its lack of compliance publically, the Company has explained its sales model in public statements as follows:

> We operate an e-commerce direct selling model in Hong Kong and recognize the revenue derived from sales to both Hong Kong and Chinese members as being generated in Hong Kong. Products purchased by members in China are delivered to third parties that act as the importers of record under agreements to pay applicable duties. In addition,

through a Chinese entity, we sell products in China using an e-commerce retail model. The Chinese entity operates separately from the Hong Kong entity, and a Chinese member may elect to participate in either or both.

### Materially False and Misleading Statements Issued During the Class Period

***1Q 2016***

62.   The Class Period starts on April 27, 2016, when the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "1Q 2016 10-Q"), which was signed by Davidson.

63.   The 1Q 2016 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions, generally in the currency for the country they were registered, for product purchases by their down-line member network across all geographic markets, ***except China, where our subsidiary maintains an e-commerce retail platform and does not pay any commissions***." (Emphasis added).

64.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

65.   In addition, the 1Q 2016 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product purchases made by their down-line members; and [2] through retail markups on sales

of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

66.    The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

67.    The 1Q 2016 10-Q also stated: "Net sales were $74.3 million for the three months ended March 31, 2016 compared with $40.7 million for the comparable period a year ago, an increase of $33.6 million, or 83%.  Hong Kong net sales increased $30.8 million, or 83%, over the comparable period a year ago. ***The sales increase was primarily due to a substantial increase in product sale volumes attributable to the effectiveness of our leadership development, promotional programs, incentives, events, new products, training, commission plans and services***." (Emphasis added).

68.    The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its pyramid scheme, rather than the "effectiveness of its leadership" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

Amended Class Action Complaint for Violation of the Federal Securities Laws

69.   In addition, the 1Q 2016 10-Q stated: "As of March 31, 2016, we had 119,800 active members, compared with 62,010 active members at March 31, 2015. Hong Kong experienced an increase of 56,900 active members, or 105%, from March 31, 2015 to March 31, 2016. *This substantial increase in the number of active members is attributable to the same factors that contributed to the increase in net sales and product sale volumes on a period-over-period basis*." (Emphasis added).

70.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its pyramid scheme, rather than the "effectiveness of its leadership" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

71.   Further, the 1Q 2016 10-Q stated:

> In January 2016, two purported class action complaints were filed against the Company and its top executives. On March 29, 2016, the court consolidated the purported class actions, appointed two Lead Plaintiffs, Messrs. Dao and Juan, and appointed the Rosen Law Firm and Levi & Korsinsky LLP as co-Lead Counsel for the purported class in the consolidated action. The court also ordered lead plaintiffs to file a consolidated complaint by April 29, 2016. The class action complaints purport to assert claims on behalf of certain of our stockholders under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against Natural Health Trends Corp., Chris T. Sharng, and Timothy S. Davidson, and to assert claims under Section 20(a) of the Securities Exchange Act of 1934 against Messrs. Sharng and Davidson. The class action complaints allege, inter alia, that the Company made materially false and misleading statements regarding the legality of its business operations in China, including running

an allegedly illegal multi-level marketing business. The class action complaints seek an indeterminate amount of damages, plus interest and costs. ***The Company believes that these claims are without merit and intends to vigorously defend against the allegations in these actions.*** (Emphasis added).

72.    The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

73.    The 1Q 2016 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2015, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2015."

74.    Among the Risk Factors identified in the Company's Annual Report on Form 10-K for the year ended December 31, 2015 (the "2015 10-K") were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

Amended Class Action Complaint for Violation of the Federal Securities Laws

75. The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

76. Also listed among the Risk Factors identified in the 2015 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations. Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

Amended Class Action Complaint for Violation of the Federal Securities Laws

77.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

78.   Attached to the 1Q 2016 10-Q as Exhibit 32.1 were certifications made by Sharng and Davidson pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes Oxley Act of 2002 ("SOX Certifications"). In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

79.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading

statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

80.     Also on April 27, 2016, the Company issued a press release (the "April 27, 2016 Press Release") regarding its financial results for 1Q 2016 in which Sharng stated the following: "The double-digit increase in revenue growth for the quarter was driven by our emphasis on leadership programs, product development and promotional incentives.

81.     The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "leadership programs" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

***2Q 2016***

82.     On July 27, 2016, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "2Q 2016 10-Q"), which was signed by Davidson.

83.     The 2Q 2016 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions, generally in the currency for the country they were registered, for product purchases by their down-line member network across all geographic markets, ***except China, where our subsidiary maintains an e-commerce retail platform and does not pay any commissions***." (Emphasis added).

84.     The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's

statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

85.    In addition, the 2Q 2016 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product purchases made by their down-line members; and [2] through retail markups on sales of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

86.    The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

87.    The 2Q 2016 10-Q also stated: "Net sales were $80.4 million for the three months ended June 30, 2016 compared with $69.7 million for the comparable period a year ago, an increase of $10.7 million, or 15%.  Hong Kong net sales increased $8.6 million, or 13%, over the comparable period a year ago. *The sales increase was primarily due to a substantial increase in product sale volumes attributable to the*

*effectiveness of our leadership development, promotional programs, incentives, events, new products, training, commission plans and services*." (Emphasis added).

88.     The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "effectiveness of our leadership development" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

89.     In addition, the 2Q 2016 10-Q stated: "As of June 30, 2016, we had 126,440 active members, compared with 76,400 active members at June 30, 2015. Hong Kong experienced an increase of 48,900 active members, or 72%, from June 30, 2015 to June 30, 2016. *This substantial increase in the number of active members is attributable to the same factors that contributed to the increase in net sales and product sale volumes on a period-over-period basis*." (Emphasis added).

90.     The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "effectiveness of our leadership development" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

91.     Further, the 2Q 2016 10-Q stated:

> In January 2016, two purported securities class action complaints were filed against the Company and its top executives. On March 29, 2016, the court consolidated the purported securities class actions, appointed two Lead Plaintiffs, Messrs. Dao and Juan, and appointed the Rosen

Law Firm and Levi & Korsinsky LLP as co-Lead Counsel for the purported class in the consolidated action. Plaintiffs filed a consolidated complaint on April 29, 2016. The consolidated complaint purports to assert claims on behalf of certain of our stockholders under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against Natural Health Trends Corp., Chris T. Sharng, and Timothy S. Davidson, and to assert claims under Section 20(a) of the Securities Exchange Act of 1934 against Chris T. Sharng, Timothy S. Davidson, and George K. Broady. The consolidated complaint alleges, inter alia, that the Company made materially false and misleading statements regarding the legality of its business operations in China, including running an allegedly illegal multi-level marketing business. The consolidated complaint seeks an indeterminate amount of damages, plus interest and costs. On June 15, 2016, the Company filed a motion to dismiss the consolidated complaint. ***The Company believes that these claims are without merit and intends to vigorously defend against the allegations in the consolidated complaint.*** (Emphasis added).

92.     The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

93.     The 2Q 2016 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31,

2015, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2015."

94.     Among the Risk Factors identified in the 2015 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

95.     The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

96.     Also listed among the Risk Factors identified in the 2015 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints.   These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes,

Amended Class Action Complaint for Violation of the Federal Securities Laws

which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations. Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

97.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

98.   Also on July 27, 2016, the Company issued a press release (the "July 27, 2016 Press Release") concerning its financial results for 2Q 2016, in which Sharng stated the following: "We once again achieved a double-digit, year-over-year increase in revenue growth driven by our emphasis on products, training, services and marketing."

99.   The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "emphasis on products" or other factors, deprived investors of

information material to the sources of the Company's success and, therefore, is actionable.

100.   Attached to the 2Q 2016 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

101.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

*__3Q 2016__*

102.   On October 25, 2016, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "3Q 2016 10-Q"), which was signed by Davidson.

103.    The 3Q 2016 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions, generally in the currency for the country they were registered, for product purchases by their down-line member network across all geographic markets, ***except China, where our subsidiary maintains an e-commerce retail platform and does not pay any commissions***." (Emphasis added).

104.    The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

105.    In addition, the 3Q 2016 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product purchases made by their down-line members; and [2] through retail markups on sales of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

106.    The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly

Amended Class Action Complaint for Violation of the Federal Securities Laws

misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

107.   The 3Q 2016 10-Q also stated: "Net sales were $225.4 million for the nine months ended September 30, 2016 compared with $191.2 million for the comparable period a year ago, an increase of $34.2 million, or 18%. Hong Kong net sales, substantially all of which were shipped to members residing in China, increased $29.4 million, or 17%, over the comparable period a year ago. ***Hong Kong experienced an increase of 27,000 active members, or 31%, from September 30, 2015 to September 30, 2016, which contributed to the increase in product sales volume. We also launched new Wellness products in the first nine months of 2016, which contributed approximately $5.8 million to our top-line growth.*** Outside of our Hong Kong business, net sales increased $4.8 million, or 37%, over the comparable nine month period a year ago, driven by a 151% increase in our China e-commerce business, a 149% increase in Europe and a 10% increase in Taiwan, offset by the performance of South Korea, which decreased 40% and our CIS market, which decreased 22%. ***The $4.3 million net sales increase in our China e-commerce business was primarily driven by our Home product line.***" (Emphasis added).

108.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "new Wellness products," "our Home product line," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

109.   In addition, the 3Q 2016 10-Q stated: "Gross profit was 80.7% of net sales for the three months ended September 30, 2016 compared with 80.2% of net sales for

- 37 -

the three months ended September 30, 2015. ***The gross profit margin percentage increase is due to higher event and training revenue***. Gross profit increased to 80.9% of net sales for the nine months ended September 30, 2016 compared with 79.6% of net sales for the nine months ended September 30, 2015 ***primarily due to higher event and training revenue, higher product margins and lower logistics costs***." (Emphasis added).

110.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "higher event and training revenue" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

111.   Further, the 3Q 2016 10-Q stated as follows:

> In January 2016, two purported securities class action complaints were filed against the Company and its top executives. On March 29, 2016, the court consolidated the purported securities class actions, appointed two Lead Plaintiffs, Messrs. Dao and Juan, and appointed the Rosen Law Firm and Levi & Korsinsky LLP as co-Lead Counsel for the purported class in the consolidated action. Plaintiffs filed a consolidated complaint on April 29, 2016. The consolidated complaint purports to assert claims on behalf of certain of our stockholders under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against Natural Health Trends Corp., Chris T. Sharng, and Timothy S. Davidson, and to assert claims under Section 20(a) of the Securities Exchange Act of 1934 against Chris T. Sharng, Timothy S. Davidson, and George K. Broady. The consolidated complaint alleges, inter alia, that the Company made materially false and misleading statements regarding the legality of its business

operations in China, including running an allegedly illegal multi-level marketing business. The consolidated complaint seeks an indeterminate amount of damages, plus interest and costs. The Company filed a motion to dismiss the consolidated complaint on June 15, 2016 and a reply in support of its motion to dismiss on August 22, 2016. The Court has not ruled on the Company's motion to dismiss yet. ***The Company believes that these claims are without merit and intends to vigorously defend against the allegations in the consolidated complaint.*** (Emphasis added).

112.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

113.   The 3Q 2016 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2015, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2015."

114.   Among the Risk Factors identified in the 2015 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our

products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

115.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

116.   Also listed among the Risk Factors identified in the 2015 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints.   These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations.   Our failure or our members' failure to comply with these regulations or new

regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

117. The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

118. Attached to the 3Q 2016 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

119. The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets,

liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

120.   Also on October 30, 2018, at 11:30 a.m. ET, Defendants hosted an earnings conference call (the "Q3 2016 Earnings Call") to discuss the Company's Q3 2016 results. During the Q3 2016 Earnings Call, Sharng stated: "Despite the revenue shortfall, we were able to increase our operating profit by 3% year over year and by 2% over the prior quarter to a record quarterly level of $15.2 million. ***This was due to the flexibility we built into many of our promotions and incentive programs***." (Emphasis added).

121.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "flexibility we built into many of our promotions and incentive programs" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

***FY 2016***

122.   On February 8, 2017, the Company issued a press release (the February 8, 2017 Press Release") announcing its financial results for the fiscal year ended December 31, 2016, in which Sharng stated the following: "[D]ue to the flexibility we have built into many of our promotions and incentive programs, we were able to generate record operating profit for the fourth quarter of 2016." After noting that the Company would be declaring a special dividend, Sharng also stated in the February 8, 2017 Press Release the following: "Our ability to return capital to our stockholders is

1  due to our robust operating cash flow driven by effective management of our working

2  capital which has kept our balance sheet strong."

3      123.    The foregoing statements were materially false and misleading. By

4  putting the cause of the Company's financial success at issue, Defendants became duty

5  bound to disclose information concerning the source of its success. Defendants' failure

6  to disclose that the Company's financial success may properly be attributable to its

7  illegal conduct, rather than the "effective management of our working capital" or other

8  factors, deprived investors of information material to the sources of the Company's

9  success and, therefore, is actionable.

10     124.    On March 10, 2017, the Company filed with the SEC its annual report on

11 Form 10-K with the SEC for the fiscal year ended December 31, 2016 (the "2016 10-

12 K"), which was signed by each of the Individual Defendants.

13     125.    The 2016 10-K stated, among other things, the following: "Under our

14 compensation plan, members are paid weekly commissions by our subsidiary in which

15 they are enrolled, generally in their home country currency, for product purchases by

16 their down-line member network across all geographic markets. ***Our China subsidiary***

17 ***maintains an e-commerce retail platform and does not pay any commissions***."

18 (Emphasis added).

19     126.    The foregoing statement was materially false and misleading because

20 Defendants knew or were reckless in not knowing that, contrary to the Company's

21 statement, NHTC illegally paid commissions to its members and employees in China

22 for each new member the existing member or employee recruited. The Company's

23 undisclosed payment of this form of commission to its members and employees

24 violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly

25 misrepresented the risk of the Chinese government's investigating and imposing

26 material civil and criminal liability for NHTC's illegal operations and the risk of the

27 Company's having to materially curtail or suspend operations.

28

Amended Class Action Complaint for Violation of the Federal Securities Laws

127.   In addition, the 2016 10-K stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product purchases made by their down-line members; and [2] through retail markups on sales of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

128.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

129.   The 2016 10-K also stated: "Net sales were $287.7 million for the year ended December 31, 2016 compared with $264.9 million a year ago, an increase of $22.8 million, or 9%.  Hong Kong net sales, substantially all of which were shipped to members residing in China, increased $17.7 million, or 7%, over the prior year. Hong Kong experienced an increase of 7,800 active members, or 8%, during 2016, which contributed to the increase in product sales volume. ***We also launched new Wellness products during 2016, which contributed approximately $11.2 million to our top-line growth***. Outside of our Hong Kong business, net sales increased $5.1 million, or 27%, compared with the prior year, driven by a 105% increase in our China e-commerce business and a 223% increase in Europe, offset by the performance of South Korea, which decreased 39% and our Commonwealth of Independent States ('CIS') market, which decreased 25%. ***The $4.7 million net sales increase in our***

***China e-commerce business was primarily driven by increased sales in
our Home product line, which was introduced during the fourth quarter of 2015***."
(Emphasis added).

130.   The foregoing statements were materially false and misleading. By
putting the cause of the Company's financial success at issue, Defendants became duty
bound to disclose information concerning the source of its success. Defendants' failure
to disclose that the Company's financial success may properly be attributable to its
illegal conduct, rather than the "increased sales in our Home product line" or other
factors, deprived investors of information material to the sources of the Company's
success and, therefore, is actionable.

131.   In addition, the 2016 10-K stated: "Gross profit was 80.9% of net sales for
the year ended December 31, 2016 compared with 79.6% of net sales for the year
ended December 31, 2015. ***The gross profit margin percentage increase is due to
higher event and training revenue, higher product margins and lower logistics
costs***." (Emphasis added).

132.   The foregoing statements were materially false and misleading. By
putting the cause of the Company's financial success at issue, Defendants became duty
bound to disclose information concerning the source of its success. Defendants' failure
to disclose that the Company's financial success may properly be attributable to its
illegal conduct, rather than the "higher event and training revenue" or other factors,
deprived investors of information material to the sources of the Company's success
and, therefore, is actionable.

133.   The 2016 10-K also stated that "[w]e are exposed to a variety of risks that
are present in our business and industry" and listed "some of the more significant
factors that could affect our business, results of operations and financial condition."

134.   Among the Risk Factors identified in the 2016 10-K were the following:
"[W]e believe that our e-commerce direct selling model in Hong Kong does not violate

Amended Class Action Complaint for Violation of the Federal Securities Laws

any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

135.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

136.   Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part.  There can be no assurance that we or our members are

- 46 -

Amended Class Action Complaint for Violation of the Federal Securities Laws

> in compliance with all of these regulations. Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

137.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

138.   Attached to the 2016 10-K as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

139.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company."

Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

***1Q 2017***

140.  On April 27, 2017, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2017 (the "1Q 2017 10-Q"), which was signed by Davidson.

141.  The 1Q 2017 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay any commissions***." (Emphasis added).

142.  The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

143.  In addition, the 1Q 2017 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product

purchases made by their down-line members; and [2] through retail markups on sales of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

144.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

145.   The 1Q 2017 10-Q also stated: "Gross profit was 81.2% of net sales for the three months ended March 31, 2017 compared with 80.8% of net sales for the three months ended March 31, 2016. **The gross profit margin percentage increase was primarily due to lower logistics costs**." (Emphasis added).

146.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "lower logistics costs" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

147.   Further, the 1Q 2017 10-Q stated as follows:

> In January 2016, two putative securities class action complaints were filed against the Company and its top

executives. On March 29, 2016, the court consolidated these actions, appointed two Lead Plaintiffs, Messrs. Dao and Juan, and appointed the Rosen Law Firm and Levi & Korsinsky LLP as co-Lead Counsel for the purported class. Plaintiffs filed a consolidated complaint on April 29, 2016. The consolidated complaint purports to assert claims on behalf of all persons who purchased or otherwise acquired our common stock between March 6, 2015 and March 15, 2016 under (i) Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder against Natural Health Trends Corp., Chris T. Sharng, and Timothy S. Davidson, and (ii) Section 20(a) of the Securities Exchange Act of 1934 against Chris T. Sharng, Timothy S. Davidson, and George K. Broady. The consolidated complaint alleges, inter alia, that the Company made materially false and misleading statements regarding the legality of its business operations in China, including running an allegedly illegal multi-level marketing business. The consolidated complaint seeks an indeterminate amount of damages, plus interest and costs. The Company filed a motion to dismiss the consolidated complaint on June 15, 2016 and a reply in support of its motion to dismiss on August 22, 2016. On December 5, 2016, the Court denied the Company's motion to dismiss. On February 17, 2017, the Company filed an answer to the consolidated complaint. ***The Company believes that these claims are without merit and intends to vigorously defend against them.*** (Emphasis added).

148.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing

material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

149.   The 1Q 2017 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2016, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2016."

150.   Among the Risk Factors identified in the Company's Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K") were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

151.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for

NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

152. Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations.  Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

153. The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

Amended Class Action Complaint for Violation of the Federal Securities Laws

154.   Attached to the 1Q 2017 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

155.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

156.   On April 27, 2017, the Company issued a press release (the April 27, 2017 Press Release") announcing its financial results for the fiscal quarter ended March 31, 2017, in which Sharng stated the following: "Our strong balance sheet and working capital management afford us the ability to focus on our growth initiatives while simultaneously returning capital to our valued stockholders."

157.   The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound

to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "strong balance sheet and working capital management" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

### *2Q 2017*

158.   On August 2, 2017, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "2Q 2017 10-Q"), which was signed by Davidson.

159.   The 2Q 2017 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay any commissions***." (Emphasis added).

160.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

161.   In addition, the 2Q 2017 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product purchases made by their down-line members; and [2] through retail markups on sales

of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

162.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

163.   The 2Q 2017 10-Q also stated: "Gross profit was 81.1% of net sales for the six months ended June 30, 2017 compared with 81.0% of net sales for the six months ended June 30, 2016. ***The gross profit margin percentage increase was primarily due to lower logistics costs, offset by lower event revenue***." (Emphasis added).

164.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "lower logistics costs" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

165.   The 2Q 2017 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31,

2016, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2016."

166.    Among the Risk Factors identified in the 2016 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

167.    The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

168.    Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes,

which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations.  Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

169.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

170.   Attached to the 2Q 2017 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

171.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal

activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

172. Also on August 2, 2017, at 11:30 a.m. ET, Defendants hosted an earnings conference call (the "Q2 2017 Earnings Call") to discuss the Company's Q2 2017 results. During the Q2 2017 Earnings Call, Sharng stated: "We've been able to maintain our gross profit margin and expand our operating income margin primarily due to proactive expense management to better align our cost structure with a more limited upside opportunities we have been seeing in the field."

173. The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "proactive expense management" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

174. On August 2, 2017, the Company issued a press release (the August 2, 2017 Press Release") announcing its financial results for the fiscal quarter ended June

30, 2017, in which Sharng stated the following: "[T]he second quarter of 2016 presented a challenging year-over-year comparison due to record product orders in anticipation of a significant product price increase effective last June. Partially offsetting the year-over-year decrease in net sales was strength in Europe, our market opening in Peru and a positive response to our most recent product introductions."

175.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than "strength in Europe, our market opening in Peru and a positive response to our most recent product introductions," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

***3Q 2017***

176.   On November 1, 2017, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2017 (the "3Q 2017 10-Q"), which was signed by Davidson.

177.   The 3Q 2017 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay any commissions***." (Emphasis added).

178.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's

Amended Class Action Complaint for Violation of the Federal Securities Laws

undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

179.   In addition, the 3Q 2017 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on product purchases made by their down-line members; and [2] through retail markups on sales of products purchased by members at wholesale prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail mark-ups on sales in that market)."

180.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

181.   The 3Q 2017 10-Q also stated: "Outside of our Hong Kong business, net sales increased $308,000, or 6%, over the comparable three month period a year ago, driven by a 54% increase in Europe and a 28% increase in our China e-commerce business. ***The $377,000 net sales increase in our China e-commerce business was primarily the result of increased sales of our Home and Wellness product lines***." (Emphasis added).

182.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "increased sales of our Home and Wellness product lines" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

183.   The 3Q 2017 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2016, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2016."

184.   Among the Risk Factors identified in the 2016 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

185.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly,

Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

186.   Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations.  Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

187.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing

material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

188.   Attached to the 3Q 2017 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

189.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

190.   On November 1, 2017, the Company issued a press release (the November 1, 2017 Press Release") announcing its financial results for the fiscal quarter ended September 30, 2017, in which Sharng stated the following: "Despite challenging market conditions, we were able to maintain a healthy gross profit margin of nearly

80% and an operating income margin of over 21% due to strong consumer allegiance to our products and proactive expense management."

191.   The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "strong consumer allegiance to our products and proactive expense management," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

192.   Also on November 1, 2017, at 11:30 a.m. ET, Defendants hosted an earnings conference call (the "Q3 2017 Earnings Call") to discuss the Company's Q3 2017 results. During the Q3 2017 Earnings Call, Sharng stated: "Our ability to preserve healthy margins is due to the strong allegiance of consumer to our products and our continued proactive expense management to better align our cost structure with a more limited upside opportunities we have been seeing in the field."

193.   The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "strong allegiance of consumer to our products and our continued proactive expense management," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

***FY 2017***

194.   On February 14, 2018, the Company issued a press release (the November 1, 2017 Press Release") announcing its financial results for the fiscal year ended December 31, 2017, in which Sharng stated the following: "We believe our ability to

increase sales over the prior quarter was a result of the improvements we made to our commission plan, combined with a number of productive incentive trips and training programs held throughout the year. Additionally, we continued to gain traction in international markets such as Europe, Southeast Asia and Japan, which all grew sales over 2016. We have also worked hard to preserve our strong margin profile despite our top-line decline through diligent expense management that aligned our cost structure to current sales levels."

195.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "improvements we made to our commission plan, combined with a number of productive incentive trips and training programs held throughout the year," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

196.   On February 14, 2018, at 12:30 p.m. ET, Defendants hosted an earnings conference call (the "Q4 2017 Earnings Call") to discuss the Company's Q4 2017 results. During the Q4 2017 Earnings Call, Sharng stated: "[T]he fourth quarter of 2017 marked our first sequential quarterly sales growth since the second quarter of 2016. *We believe this was a result of the improvements we've made to our commission plans, combined with a number of effective incentive trips and training programs*." (Emphasis added).

197.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "the improvements we've made to our commission

plans, combined with a number of effective incentive trips and training programs," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

198.   On March 27, 2018, the Company filed with the SEC its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"), which was signed by each of the Individual Defendants.

199.   The 2017 10-K stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions***." (Emphasis added).

200.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

201.   In addition, the 2017 10-K stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on the accumulated bonus volume from product purchases made by their down-line members and customers; and [2] through retail profits on sales of products purchased by members at discount and wholesale prices and resold at retail prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail profits)."

202.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

203.   The 2017 10-K also stated that "[w]e are exposed to a variety of risks that are present in our business and industry" and listed "some of the more significant factors that could affect our business, results of operations and financial condition."

204.   Among the Risk Factors identified in the 2017 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

205.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for

Amended Class Action Complaint for Violation of the Federal Securities Laws

NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

206.   Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations.  Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

207.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

208.   Attached to the 2017 10-K as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

209.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

*1Q 2018*

210.   On May 2, 2018, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2018 (the "1Q 2018 10-Q"), which was signed by Davidson.

211.   The 1Q 2018 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by

Amended Class Action Complaint for Violation of the Federal Securities Laws

their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions***." (Emphasis added).

212. The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

213. In addition, the 1Q 2018 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on the accumulated bonus volume from product purchases made by their down-line members and customers; and [2] through retail profits on sales of products purchased by members at wholesale prices and resold at retail prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail profits)."

214. The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing

material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

215.   The 1Q 2018 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017," except that the Company modified the risk factor regarding the derivative lawsuits to "reflect the classwide settlement of the securities class action, referenced Part II, Item of 1 of this report."

216.   Among the Risk Factors identified in the 2017 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

217.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for

Amended Class Action Complaint for Violation of the Federal Securities Laws

NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

218.   Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations.  Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

219.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

220.   Attached to the 1Q 2018 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

221.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

### *2Q 2018*

222.   On May 2, 2018, the Company issued a press release (the May 2, 2018 Press Release") announcing its financial results for the fiscal quarter ended March 31, 2017, in which Sharng stated the following: "Our improved top-line performance is a direct result of the enhancements made to our commission plan to better incentivize up-and-coming members and ease rank advancement, along with our effective marketing programs. We also held our international Ambassador Academy in Hong

Kong, which attracted over 5,500 people. The orders generated by promotions directly related to the event exceeded those of the last three years."

223.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "enhancements made to our commission plan to better incentivize up-and-coming members and ease rank advancement, along with our effective marketing programs," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

224.   Also on May 2, 2018, at 11:30 a.m. ET, Defendants hosted an earnings conference call (the "Q1 2018 Earnings Call") to discuss the Company's Q1 2018 results. During the Q1 2018 Earnings Call, Sharng stated: "Specifically, we believe that the enhancement made to our commission plan to better incentivize up-and-comers and ease rank advancement, along with our effective marketing programs, drove the sequential sales growth. As previously discussed, we began implementing additional enhancements to help direct more resources to lower and mid-level rank members, including a onetime cash bonus for new participants in the international recognition program."

225.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "enhancement made to our commission plan to better incentivize up-and-comers and ease rank advancement, along with our effective marketing programs" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

226.   On August 1, 2018, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "2Q 2018 10-Q"), which was signed by Davidson.

227.   The 2Q 2018 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions***." (Emphasis added).

228.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

229.   In addition, the 2Q 2018 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on the accumulated bonus volume from product purchases made by their down-line members and customers; and [2] through retail profits on sales of products purchased by members at wholesale prices and resold at retail prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail profits)."

230.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's

statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

231.   The 2Q 2018 10-Q also stated: "Outside of our Hong Kong business, net sales increased $518,000, or 9%, over the comparable three month period a year ago, driven largely by a 105% increase in our China e-commerce business, partially offset by a 46% decrease in Taiwan. ***The $1.3 million net sales increase in our China e-commerce business was primarily the result of increased sales of our Home product line due to a one-time promotion, and also increased sales of our Wellness product line***." (Emphasis added).

232.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "increased sales of our Home product line due to a one-time promotion, and also increased sales of our Wellness product line," or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

233.   The 2Q 2018 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no

Amended Class Action Complaint for Violation of the Federal Securities Laws

material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017, except that we delete the risk factor captioned 'We are currently being sued in three lawsuits alleging, among other things, that we made materially false and misleading statements regarding the legality of our business operations in China.' As disclosed elsewhere in this report, these lawsuits have now been fully settled."

234.    Among the Risk Factors identified in the 2017 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

235.    The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

236.    Also listed among the Risk Factors identified in the 2016 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations,

- 77 -

court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products. They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations. Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

237. The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

238. Attached to the 2Q 2018 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

239.   The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

### *3Q 2018*

240.   On October 30, 2018, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2017 (the "3Q 2018 10-Q"), which was signed by Davidson.

241.   The 3Q 2018 10-Q stated, among other things, the following: "Under our compensation plan, members are paid weekly commissions by our subsidiary in which they are enrolled, generally in their home country currency, for product purchases by their down-line member network across all geographic markets. ***Our China subsidiary maintains an e-commerce retail platform and does not pay commissions***." (Emphasis added).

242.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China

for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

243.   In addition, the 3Q 2018 10-Q stated: "Currently, there are basically two ways in which our members can earn income: [1] through commissions paid on the accumulated bonus volume from product purchases made by their down-line members and customers; and [2] through retail profits on sales of products purchased by members at wholesale prices and resold at retail prices (in the majority of our markets, sales are for personal consumption only and income may not be earned through retail profits)."

244.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

245.   The 3Q 2018 10-Q also stated: "Net sales were $47.0 million for the three months ended September 30, 2018 compared with $40.1 million for the comparable period a year ago, an increase of $6.9 million, or 17%. Hong Kong net sales, substantially all of which were shipped to members residing in China, increased $6.4 million, or 18%, over the comparable period a year ago. ***Our revenue in the third***

*quarter increased year-over-year as a result of our effective marketing programs and was further fueled by our Ambassador Academy in Hong Kong*. Outside of our Hong Kong business, net sales increased $513,000, or 10%, over the comparable three month period a year ago, driven largely by a 59% increase in our Americas business, partially offset by a 24% decrease in Taiwan. *The $731,000 net sales increase in our Americas business was primarily due to product sales of Airelle®, our new age-defying skincare system which was launched in June 2018, and increased order volume from our Peruvian business which began accepting orders in June 2017*." (Emphasis added).

246.   The foregoing statements were materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "effective marketing programs" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

247.   The 3Q 2018 10-Q also stated: "Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, 'Risk Factors' in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017, except that we (1) previously deleted the risk factor captioned 'We are currently being sued in three lawsuits alleging, among other things, that we made materially false and misleading statements regarding the legality of our business operations in China' and (2) are now adding the following risk factor" regarding the potential impact of 'recently enacted tariffs," "other potential changes to

tariff and import/export regulations," and "ongoing trade disputes between the United States and other jurisdictions, particularly China."

248.    Among the Risk Factors identified in the 2017 10-K were the following: "[W]e believe that our e-commerce direct selling model in Hong Kong does not violate any applicable laws in China, even though it is used for the internet purchase of our products by members in China. We also believe that our Chinese entity, including its e-commerce retail platform, is operating in compliance with applicable Chinese laws."

249.   The foregoing statements were materially false and misleading because Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company's sales of Noni Juice product within the PRC did not comply with either of the two requirements for entry as a foreign health food into the Chinese domestic market. In addition, Defendants knew or recklessly disregarded that, contrary to the Company's statement, the Company made false claims about certain health benefits of the Noni Juice product within the PRC and misled consumers regarding the origins of the Noni Juice product in violation of Chinese law and regulations. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

250.    Also listed among the Risk Factors identified in the 2017 10-K were the following:

> Our direct selling system is subject to extensive laws, governmental regulations, administrative determinations, court decisions and similar constraints. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as 'pyramid' schemes, which compensate participants for recruiting additional participants irrespective of product sales, use high pressure recruiting methods and/or do not involve legitimate products.

They also seek to ensure that claims regarding the ability of participants to earn money are truthful and substantiated. Complying with these widely varying and sometimes inconsistent rules and regulations can be difficult and may require the devotion of significant resources on our part. There can be no assurance that we or our members are in compliance with all of these regulations. Our failure or our members' failure to comply with these regulations or new regulations could lead to the imposition of significant penalties or claims and could negatively impact our business.

251. The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

252. Attached to the 3Q 2018 10-Q as Exhibit 32.1 were the SOX Certifications by Sharng and Davidson. In the SOX Certifications, Sharng and Davidson certified that, to the best of their knowledge: (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

253. The foregoing statements were false and misleading because Defendants knew or were reckless in not knowing that, without disclosing NHTC's illegal activities, including (i) paying commissions prohibited by the Pyramid Law, (ii) not complying with the PRC's requirements for entry of its Noni Juice products as foreign

health foods into the Chinese domestic market, (iii) making false claims about certain health benefits of the product within the PRC, and (iv) misleading Chinese consumers regarding the origins of the product, the Report did not "fairly present[]," in all material respects, the financial condition and results of operations of the Company." Defendants' payment of commissions to members and employees in China and sales of Noni Juice in the Chinese domestic market were material to NHTC's business assets, liabilities, income and expenses, and cash flows. Defendants' false and misleading statements regarding the Company's payment of commissions and compliance with applicable commercial laws and regulations of the PRC rendered their SOX Certifications materially false.

254.   Also on October 30, 2018, at 11:30 a.m. ET, Defendants hosted an earnings conference call (the "Q3 2018 Earnings Call") to discuss the Company's Q3 2018 results. During the Q3 2018 Earnings Call, Sharng stated: "In summary, our performance in the third quarter reflected a continuation of the effectiveness of our marketing programs and solid demand for our products since the beginning of the year."

255.   The foregoing statement was materially false and misleading. By putting the cause of the Company's financial success at issue, Defendants became duty bound to disclose information concerning the source of its success. Defendants' failure to disclose that the Company's financial success may properly be attributable to its illegal conduct, rather than the "effectiveness of our marketing programs and solid demand for our products" or other factors, deprived investors of information material to the sources of the Company's success and, therefore, is actionable.

### *NHTC's Response to the CCTV Exposé*

256.   On January 6, 2019 the Company issued a press release (the January 6, 2019 Press Release") responding to the CCTV Exposé, revealing that NHTC has been operating in violation of the Pyramid Law. The January 6, 2019 Press Release stated:

"The Company rejects the claims made that Natural Health Trends is operating illegally in China. The Company believes short sellers arranged with associates at CCTV to create a deceptive exposé about the Company and its products attempting to misleadingly portray the business as a pyramid scheme." Sharng stated the following: "Natural Health Trends is committed to conducting business with honesty, integrity and fairness in accordance with the highest ethical standards. We are confident that our operations in China are in compliance with all applicable regulations. We believe these inaccurate claims were made in an effort to damage our brand, business in China, reputation and shareholder value, and we are prepared to vigorously defend our Company."

257.   The foregoing statement was materially false and misleading because Defendants knew or were reckless in not knowing that, contrary to the Company's statement, NHTC illegally paid commissions to its members and employees in China for each new member the existing member or employee recruited. The Company's undisclosed payment of this form of commission to its members and employees violates Chinese law and regulation. Accordingly, Defendants knowingly or recklessly misrepresented the risk of the Chinese government's investigating and imposing material civil and criminal liability for NHTC's illegal operations and the risk of the Company's having to materially curtail or suspend operations.

**The Truth Emerges**

258.   On Saturday, January 5, 2019, PRC-sanctioned CCTV aired the CCTV Exposé, revealing, among other things, that NHTC had been misrepresenting Noni Juice as a product that "can comprehensively restore damaged cells in the human body" and as "effective against cancer, gout, insomnia, kidney deficiencies, excessive stress, depression, and obesity."

259.   The January 5 CCTV Exposé also revealed that NHTC had been failing to comply with either of the two "formal channels for foreign health foods to enter the

Chinese market." First, products may be sold "directly and offline at a retail store with the blue hat logo of approval from the State Supervisory Authority." Alternatively, products may enter the Chinese domestic market if they meet "the current requirements for cross-border e-commerce."

260. NHTC, according to the January 5 CCTV Exposé, "uses a selling style similar to abroad purchase and does not belong to either category." Instead, it engages in "hybridized e-commerce," by which "[a]ll of [its] edible products are imported from abroad," despite the fact that "there is no domestic approval or listing in the record of [Noni Juice]."

261. The CCTV Exposé explained:

> In recent years, goods from overseas have become widely sought after by domestic consumers, with foods especially claiming to possess health effects becoming the focus of purchases. We can see that this health juice product has adopted the method of wearing a foreign jacket and caught the attention of domestic consumers. [NHTC] claims that this juice originates in the United States. If consumers want to purchase it, they can order it from the Hong Kong website of [NHTC], and it is not available on the official domestic website. Consumers believe they have purchased this product from abroad, but in fact there is no domestic approval or listing in the record of this health food. Even more noteworthy is that, while the senior members of [NHTC] sensationalize its miraculous effects, to the extent that it can even treat terminal diseases, the company's website only says that it is a functional health drink.

262. In addition, the CCTV Exposé revealed that NHTC compensates members based on their recruitment of additional members. In an excerpt from an online video of a sharing meeting, in which participation is reserved exclusively for NHTC members, a "higher-level member" explained to new members that "[i]f you only recommend two members in the first month, your income will be 116 USD. Then in

the second month, if it's doubled to four members, then your income is 332 USD, increasing by a factor of 2 to the *n*-th power. So, my total annual income is 679,770 USD."

263. Further, the CCTV Exposé detailed how NHTC's payment of commissions enabled the Company to retain many of its recruits through the promise of greater rewards. One of the Company's "self-proclaimed senior members," Ms. Hu, explained the lure of NHTC's paying commissions to its members in China for recruiting new members: "Why? Because occupying the 20,000 RMB node means that all the people with points under you are connected to you, his points are connected to you, the members he recruits later have something to do with you for your whole lifetime." Another "senior member," Mr. Ye, explained that "member rank increases as more and more people are recruited offline," which allows a member to "obtain[ ] increasingly generous bonuses": "Each level has different rewards. What benefits will the company give you as your level increases? At level 9, the highest level, your children can go to the United States and study for free."

264. The CCTV Exposé also presented the opinion of a legal expert, Yushan Yue, who stated: "Just like how this scheme in the name of selling juice actually uses this kind of form of networking and recruitment to make money, it can essentially be categorized as belonging to pyramid scheme behavior. Because we note that pyramid schemes are not so much about selling products. But rather, they are about recruiting others and determining income on the basis of one's level. Then this is usually what we call a pyramid scheme. In serious instances, it may even violate criminal law." Mr. Yue also opined that, despite some concerns stated earlier in the program that NHTC's activities were beyond the reach of Chinese authorities, "[a]s long as the online marketing activities of these overseas enterprises touch on Chinese territory, they are under the jurisdiction of Chinese law."

265.   On this news, on the first trading day after the CCTV Exposé, the per-share price of NHTC common stock fell $2.72, or approximately 14%, from its close of $19.41 on Friday, January 4, 2019 to open on the morning of Monday, January 7, 2019 at $16.69 per share. As a result, NHTC investors were damaged.

266.   On Sunday, January 6, 2019, Seeking Alpha published an article ("January 6 Seeking Alpha Article") on its website regarding the airing of the January 5 CCTV Exposé. The January 6 Seeking Alpha Article noted that the NHTC segment was 17 minutes in duration and was broadcast twice the previous day on CCTV 13, which is "the news channel of China Central Television and the biggest news channel on mainland China."[9]  The January 6 Seeking Alpha Article also reported that the Company responded to the January 5 CCTV Exposé by "pretty much recycling a[n] 8 months old comment/communication."

267.   On Monday, January 7, 2019, at 9:59 a.m., Seeking Alpha published a short report ("January 7 Seeking Alpha Report"), stating that "[s]hares of [NHTC] are down 24.4% after allegations against the company were aired on China Central Television."[10]  The January 7 Seeking Alpha Report also noted that "[t]he company says it believes short sellers arranged the TV spot," and that the Company stated in response: "We are confident that our operations in China are in compliance with all applicable regulations. We believe these inaccurate claims were made in an effort to damage our brand, business in China, reputation and shareholder value, and we are prepared to vigorously defend our Company."

---

[9] A copy of the January 6 Seeking Alpha Article is attached hereto as Exhibit D and incorporated herein by reference.

[10] A copy of the January 7 Seeking Alpha Report is attached hereto as Exhibit E and incorporated herein by reference.

Amended Class Action Complaint for Violation of the Federal Securities Laws

268.   Also on Monday, January 7, 2019, GeoInvesting published a report ("January 7 GeoInvesting Report") online that purported to summarize for investors, in the English language, the content of the CCTV Exposé.[11]

269.   On this news, the per-share price of NHTC common stock fell an additional $2.08, or approximately 12.5%, from its opening price on Monday, January 7, 2019 to close at $14.61 at the market's close that same day. As a result, NHTC investors were damaged.

270.   On January 19, 2019, NHTC held a press conference in which Wu Yaotang, NHTC's manager for Greater China, apologized publically on behalf of the Company for misleading consumers and some members, and for having caused financial losses to some members. Responding to media reports that NHTC exaggerated its product effects and developed multi-level members, NHTC pledged that it would conduct a serious self-inspection and self-correction, cooperate with relevant government authorities, and sternly punish violators.

271.   On January 25, 2019, the Supreme People's Procuratorate, the Ministry of Public Security, China Consumers' Association, the All China Lawyers Association, and China Media Group collectively published the Top 10 Consumer Rights Violation Incidents. "Quanjian's and NHTC's alleged pyramid marketing and hyping product effects; disease in the health care product industry hard to cure" is listed as the No. 2 incident.

272.   A notice published on the Harbin State Administration of Market Regulation website on February 3, 2019 states that the fraudulent promotions and advertisements, and illegal pyramid marketing of NHTC should be cracked down in a stern measure.

---

[11] A copy of the January 7 GeoInvesting Report is attached hereto as Exhibit F and incorporated herein by reference.

Amended Class Action Complaint for Violation of the Federal Securities Laws

273.   After the close of the market on February 21, 2019, the Company issued a press release in which Defendants admitted that:

> [G]iven the global macroeconomic backdrop and the increased regulatory and media scrutiny in China, we are cautious regarding our performance in 2019 due to the potential impact on our operations from the global trade environment, exchange rate fluctuations, adverse local publicity and the Chinese government's 100-day campaign. As a result of this campaign and consistent with our past strategies and those of peers, ***we voluntarily decided in January to temporarily suspend our member activities while proactively cooperating with all relevant government agencies to ensure we continue to conduct our business in compliance with all applicable laws in China***. While I am confident this is the best approach to position our Company to successfully operate in the long-term, ***this suspension of member activities may have a material adverse effect on our business in the near-term***. (Emphasis added).

274.   On this news, the per-share price of NHTC common stock fell $1.85, or approximately 13%, from its closing price on February 21, 2019 to open at $12.26 at on February 22, 2019. As a result, NHTC investors were damaged.

275.   On March 18, 2019, the Company filed with the SEC a Notification of Late Filing on Form 12b-25, stating that the Company was "unable to file its Annual Report on Form 10-K for the year ended December 31, 2018 by the due date of March 18, 2019, as management has not yet completed its assessment of the Company's internal control over financial reporting as of December 31, 2018; accordingly, the Company's independent registered accounting firm has not yet completed its integrated audit."

276.   On April 26, 2019, the Company filed with the SEC its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by each of the Individual Defendants.

277.   In the 2018 10-K, the Company stated:

In January 2019 we, like some of our peers, voluntarily decided to temporarily suspend our member activities, such as product roadshows, product trainings and larger company-sponsored events, in China as we did in 2007. We did this because we have learned that the 100-day campaign was announced in broad outlines by the central government, and the interpretation and enforcement of the campaign was delegated to the provincial and local governments. We consider it a top priority for our business to develop an understanding of and cooperate with all levels and jurisdictions of the government agencies and did not want to run the risk of being inadvertently entangled in the government enforcement actions. Our suspension of member activities currently remains in effect, and it may be necessary or advisable to repeat this or similar actions from time to time in the future, and such periods of reduced activity can and do have a material adverse effect on our business. Although we understand the 100-day campaign would have expired on or about April 18, 2019, we are not aware of any information indicating that the campaign has been concluded.

278.   On May 7, 2019, the Company filed with the SEC its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q 2019 10-Q"), which was signed by Davidson.

279.   In the 1Q 2019 10-Q, the Company stated:

On January 8, 2019, the Chinese government announced a comprehensive 100-day campaign focusing on companies involved in the sale of food, equipment, daily necessities, small home electrical appliances and services that are claimed to promote health. The Chinese government ministries in charge of this campaign indicated that they are targeting illegal practices in the industry, particularly the manufacture and sale of counterfeit and substandard products, and false advertising and misleading claims as to the health benefits of products and services. It is understood

that the campaign is specifically focused on the business practices of direct selling companies. During the campaign, we understand that the government will not issue any additional direct selling licenses, will cease issuing certifications of quality or other approvals of various healthcare products, and will review its regulatory oversight of the industry. We believe that the campaign will negatively impact our business in China in the short-term, but will benefit us and Chinese consumers in the long-term as purveyors of substandard products are driven from the market. ***The short-term impact of the campaign has had a significant impact on our business, as we, like some of our peers, voluntarily decided in January 2019 to temporarily suspend our member activities, such as product roadshows, product trainings and larger company-sponsored events, in China***. ***We did this because we have learned that the 100-day campaign was announced in broad outlines by the central government, and the interpretation and enforcement of the campaign was delegated to the provincial and local governments***. We consider it a top priority for our business to develop an understanding of and cooperate with all levels and jurisdictions of the government agencies, and did not want to run the risk of being inadvertently entangled in government enforcement actions. ***Although we understand the 100-day campaign would have expired on or about April 18, 2019, we are not aware of any information indicating that the campaign has been concluded***. In any case, these recent events and ***our currently effective suspension of member activities are negatively impacting our business in Hong Kong and China***, and ***we expect that Hong Kong net sales (substantially all of which were derived from products shipped to members residing in China) for the first half of 2019, and possibly beyond, will be substantially lower than comparable periods in 2018***. This anticipated decline in revenue will likely be greater than our ability to correspondingly reduce expenses, which could result in negative cash flows and a decreasing cash balance. (Emphasis added).

Amended Class Action Complaint for Violation of the Federal Securities Laws

280.   Indeed, NHTC's suspension of "member activities" had a substantial negative impact upon the Company's performance. For example, for 1Q 2019, NHTC reported net sales of just $19,328,000, compared with $52,367,000 for 1Q 2018. For 1Q 2019, NHTC reported a net loss of $1,923,000, compared with net income of $8,824,000 for 1Q 2018.

281.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

282.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired NHTC securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, the officers and directors of NHTC, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Individual Defendants have or had a controlling interest.

283.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NHTC securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

284.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

285.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

286.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NHTC;

- whether the Individual Defendants caused NHTC to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of NHTC securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

287.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

Amended Class Action Complaint for Violation of the Federal Securities Laws

288. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NASDAQ, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

289. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

290. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

291.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

292.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

293.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

294.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

295.   Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the

material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

296.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

297.   Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

298.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

299.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

Amended Class Action Complaint for Violation of the Federal Securities Laws

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

300.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

301.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

302.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

303.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

304.   Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions

of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

305. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

Amended Class Action Complaint for Violation of the Federal Securities Laws

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 3, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Counsel for Plaintiff***

Amended Class Action Complaint for Violation of the Federal Securities Laws

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2019, I electronically filed the foregoing *Amended Class Action Complaint for Violation of the Federal Securities Laws* with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

THE ROSEN LAW FIRM, P.A.

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

*Counsel for Plaintiff*

Amended Class Action Complaint for Violation of the Federal Securities Laws